**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| MONTICELLO ENTERPRISES LLC, *Plaintiff* | §<br>§<br>§ | |
| v. | §<br>§ | Case No.  W-23-CA-00753-XR |
| MACY'S,  INC.,  MACY'S  RETAIL HOLDINGS, LLC, MACYS.COM, LLC, BLUEMERCURY, INC., *Defendants* | §<br>§<br>§<br>§<br>§ | |

| | | |
|---|---|---|
| MONTICELLO ENTERPRISES LLC, *Plaintiff* | §<br>§<br>§ | |
| v. | §<br>§ | Case No.  W-23-CA-00761-XR |
| PETCO  HEALTH  &  WELLNESS COMPANY,  INC.,  PETCO  ANIMALS SUPPLY STORES, INC., *Defendants* | §<br>§<br>§<br>§<br>§ | |

| | | |
|---|---|---|
| MONTICELLO ENTERPRISES LLC, *Plaintiff* | §<br>§<br>§ | |
| v. | §<br>§ | Case No.  W-23-CA-00763-XR |
| STARBUCKS CORPORATION, *Defendant* | §<br>§<br>§ | |

**ORDER ADOPTING REPORT AND RECOMMENDATION IN PART**

On this date, the Court considered Magistrate Judge Derek T. Gilliland's Report and Recommendation ("R&R") (ECF No. 78) regarding Defendants' Joint Motion for Summary Judgment (ECF Nos. 58, 60), as well as Plaintiff's objections to the R&R (ECF No. 80). Judge Gilliland recommends granting the Motion. After careful consideration, the Court **ADOPTS**

1

Judge Gilliland's recommendation **IN PART**, **GRANTS** the Motion, and **DISMISSES** these consolidated cases.

## BACKGROUND

### I.    Factual Background

Plaintiff owns several patents concerning the processing of electronic payments. Plaintiff licensed the relevant patents to Allied Security Trust I ("AST"). ECF No. 60-4. Under that license, AST could sublicense the patents to its members using form agreements titled "Patent Sublicense Agreement[s]" ("PSAs"). ECF No. 60-4 at 1. Accordingly, AST sublicensed the patents to Apple, Google, and Samsung (the "Initial Sublicensees"). ECF Nos. 60-6, 60-7, 60-8.[1]

Defendants are merchants who allow their customers to make payments using Apple Pay, Google Pay, and/or Samsung Pay (the "Pay Systems"). ECF Nos. 37, 38, 39. Plaintiff sued Defendants for patent infringement based on their use of the Pay Systems. Defendants filed this Motion for Summary Judgment, arguing that Plaintiff's claims are precluded by sublicenses authorized and/or granted by the Initial Sublicensees' PSAs. The Motion was referred to Magistrate Judge Gilliland, who issued an R&R on February 27, 2026, recommending that the Motion be granted. Plaintiff timely filed objections. ECF No. 80.

---

[1] The PSAs at issue are materially identical. But Samsung's agreement has slightly different section numbers than Apple's and Google's. *Compare* ECF Nos. 60-7 (Google) & 60-8 (Apple) *with* ECF No. 60-6 (Samsung). For example, Section 2.2.1 of the Samsung agreement corresponds with Section 2.2.2. of the other agreements. Similarly, Section 2.2.5 of the Samsung agreement corresponds to Section 2.2.6 of the others. For simplicity, the Court references section numbers from the Google and Apple agreements.

II.    **The Report and Recommendation**[2]

a.  The Relationship Between the Initial Sublicensees and Defendants

The R&R starts by addressing Plaintiff's argument that the PSAs only provide the *ability* to sublicense and that the Initial Sublicensees have not actually *granted* Defendants any sublicenses.

The R&R disagrees with that argument for two reasons.  First, at least some of the PSAs' provisions apply automatically to Defendants, as described later in the R&R.  Second, there is sufficient evidence that the Initial Sublicensees granted Defendants an implied sublicense.  Apple provided direct evidence that it intended for Defendants to have sublicenses.  ECF No. 60-11; ECF No. 72 at 9 n.2 (citing Apple's terms of service, which include license language).  And Defendants have provided unrebutted evidence that the Initial Sublicensees provided instructions, requirements, and application programming interfaces ("APIs") to enable Defendants to use the Pay Systems.  According to the R&R, the provision of such specifications demonstrates the intent necessary to establish an implied sublicense.

b.  Provisions of the PSAs

Having dismissed the argument that Defendants lack a necessary agreement with the Initial Sublicensees, the R&R determines that several of the PSAs' provisions either independently protect Defendants or authorize the Initial Sublicensees' implied sublicenses to Defendants.

*1. Section 2.3*

Section 2.3 of the PSAs provides that:

Authorized Third Parties who obtain an Acquired Item shall be granted a non-exclusive sublicense . . . to:

---

[2] This section is a summary of the R&R and does not necessarily reflect the Court's agreement with the R&R on issues not analyzed in the Discussion section of this Order.

(a) make, use, sell, offer for sale, or import . . . a combination of Acquired Items; and/or . . . a combination of one or more Acquired Items with one or more other items . . . ; provided and to the extent that the Acquired Item(s), so combined, give rise to the combination being a Licensed Product . . . ; and/or

(b) use a method or process that includes steps implemented by an Acquired Item in combination with other steps . . . .

ECF No. 60-7 at 5.

An "Authorized Third Party" is defined as:

Any Entity that is implicitly or explicitly authorized by Sublicensee or its Affiliates as of or after the Effective Date, to exercise any legal rights or to perform any activities with respect to an Acquired Item, including without limitation . . . replicators, integrators, . . . customers and users, but only for the time period during which such authorization exists.

ECF No. 60-7 at 1–2.

An "Acquired Item" is:

(i) an item obtained, directly or indirectly, from Sublicensee or any of its Affiliates, wherein such obtained item individually embodies one or more elements of a claim of a Licensed Patent, but is not itself a Licensed Product; (ii) plural items obtained, directly or indirectly, from Sublicensee or any of its Affiliates, wherein such obtained items, as used together, both embody one or more elements of a claim of a Licensed Patent and are not a Licensed Product; and/or (iii) a Licensed Product obtained, directly or indirectly, from Sublicensee or any of its Affiliates, whether any such Licensed Product is so obtained as a single product, or as a plurality of products that together form the Licensed product. An item, as used herein, may be an article, component, software, specification, design, architecture, or other embodiment of one or more elements of a claim of a Licensed Patent. An Acquired Item shall also include a specification, design, architecture, technology, standard and/or interface licensed, provided, specified, distributed and/or developed, in whole or in part, by Sublicensee or its Affiliates.

ECF No. 60-7 at 2.

No party disputes that the patents at issue here are "Licensed Patents." And a "Licensed Product" is defined very broadly as "any and all product, hardware, machine, process, software, service, media or composition of matter." *Id.*

The R&R finds that Defendants are Authorized Third Parties who obtained an Acquired Item. Plaintiff argues that, nonetheless, Section 2.3 does not grant a sublicense—instead, it simply says a license "shall be granted." Plaintiff also points to Section 2.1, which says that the sublicense to the Initial Sublicensees is "non-sublicensable (except as set out in *Section 2.2*)." ECF No. 60-7 at 2–3 (emphasis added). Section 2.3 is not in Section 2.2, so Plaintiff argues that Section 2.3 cannot support a sublicense.

The R&R disagrees for two reasons. First, it finds that the word "shall" is mandatory, meaning Section 2.3 does, indeed, grant sublicenses. ECF No. 78 at 6. Second, it finds that Section 2.1 "limit[s] sublicenses in circumstances not contemplated in other sections of the agreement, but that it is clear Section 2.3 grants" sublicenses. ECF No. 78 at 9.

### 2. Section 2.2.2

The R&R next finds that Section 2.2.2 provides Defendants sublicenses as "end user customers" of the Initial Sublicensees. *Id.* Section 2.2.2 allows the Initial Sublicensees to sublicense to "end user customers . . . Licensed Product(s) to permit such customers to use such Licensed Product(s) (including practicing any method, process or procedure applicable to such Licensed Product)." ECF No. 60-7 at 3. According to the R&R, Defendants inherently act as "end user customers" by implementing the Pay Systems, so Section 2.2.2 applies.

### 3. Section 2.2.6

Next, the R&R finds that Defendants have sublicenses under Section 2.2.6 of the PSAs. Section 2.2.6 allows the Initial Sublicensees to grant sublicenses to

> Authorized Third Parties . . . to . . . use . . . that portion of any product or method that implements, incorporates, conforms to, is derived from and/or complies with specifications, designs, architectures, technologies, standards, and/or interfaces licensed, provided, specified, distributed, and/or developed, in whole or in part, by Sublicensee or its Affiliates, provided however, that such sublicenses shall extend only to those portions of such specifications, designs, architectures, technologies,

standards, and/or interfaces that are owned by or were developed by Sublicensee or its Affiliates, or for which Sublicensee or its Affiliates has undertaken an indemnification obligation.

ECF No. 60-7 at 4.

The R&R points to uncontroverted evidence that Defendants' allegedly infringing activities "implement" and "conform" to "specifications, . . . standards, and/or interfaces" provided by the Initial Sublicensees.  ECF No. 78 at 11(citing ECF No. 58-15 ¶¶ 8–9, 17–18; ECF No. 58-16 ¶¶ 8–9; ECF no. 58-17 ¶ 7).  That is to say, the Initial Sublicensees provide instructions, requirements, and APIs that Defendants follow and use to implement the Pay Systems.  Further, those instructions, requirements and APIs, were developed and are owned by the Initial Sublicensees.  *Id.* (citing ECF No. 72 at 12–13).  Section 2.2.6 is thus an additional basis on which the R&R recommends granting summary judgment.

### 4. *Section 2.5*

The R&R next finds that Section 2.5 grants Defendants immunity from Plaintiff's claims.  Section 2.5 states:

> If Sublicensee or any of its Affiliates licenses or provides a proprietary specification to a third party, where such specification includes a definition of one or more proprietary communication interfaces or protocols that are necessary for a third party product to interoperate with a Licensed Product and such proprietary specification is not associated with any industry standards specification, such third party shall be immune from any claim or suit under any Licensed Patent for making, using, importing, selling and/or offering for sale those portions of such third party product that implement such proprietary communication interfaces or protocols to communicate with such product or portion thereof that is a Licensed Product.

ECF No. 60-7 at 5.

Plaintiff argues that even though the Initial Sublicensees provided "proprietary specifications"—that is, their APIs—to Defendants, those specifications are not "necessary for a third party product to interoperate with a Licensed Product."  ECF No. 71 at 20–21.  That is the

case, Plaintiff says, because Defendants could use an alternative, non-proprietary API called the "W3C Payment Request API." *Id.* The R&R dismisses this argument because Defendants do not use the W3C API, making it necessary for them to use the Initial Sublicensees' APIs. ECF No. 78 at 12.

Plaintiff also argues that the W3C API is an "industry standards specification" with which the Initial Sublicensees' APIs are associated. ECF No. 71 at 21–22. If that were the case, Section 2.5 would not apply. ECF No. 60 7 at 5. In support of this argument, Plaintiff notes that the W3C API appears on Apple's website as an alternative that can be used to implement Apple Pay. But the R&R notes that there is no evidence in the record to support the claim that the W3C API is an industry standard—in fact, the R&R understands Plaintiff to have conceded that the W3C API is *not* currently an industry standard. ECF No. 78 at 12.

According to the R&R, Defendants (1) are third parties (2) who are using proprietary specifications provided by the Initial Sublicensees, (3) those specifications are "necessary for a third party product to interoperate with a Licensed Product," and (4) the specifications are "not associated with any industry standards specification." So the R&R finds that Section 2.5 applies and that Defendants are immune from Plaintiff's claims.

### 5. *Section 3.1*

Finally, the R&R determines that Section 3.1 releases Defendants from Plaintiff's claims. ECF No. 78 at 12–14. Section 3.1 releases "Sublicensee Released Parties" from "Sublicensee Claims" and provides that Plaintiff and the Initial Sublicensees covenant not to sue "any Sublicensee Released Party with any such Sublicensee Claims; provided that [the PSA] would be a complete defense against such Sublicensee Claims had such acts occurred as of or after the" relevant PSA's effective date. ECF No. 60-7 at 5–6. "Sublicensee Released Parties" include the

Initial Sublicensees, their affiliates, Authorized Third Parties, and each of those entities' "replicators, integrators, . . . users, and customers." *Id.* "Sublicensee Claims" are claims "for known or unknown acts, related to or based upon any claim of infringement of the Licensed Patents, that occurred prior to the Effective Date" of the relevant PSA. *Id.* The release granted under Section 3.1 to users and Authorized Third Parties is "only to the extent of [their] capacity as such of, for or on behalf of Sublicensee or any of its Affiliates." *Id.*

The R&R finds that Defendants have provided sufficient evidence to establish that they are Authorized Third Parties, integrators, users, and customers of the Pay Systems. Defendants are thus "Sublicensee Released Parties," and Section 3.1 releases the claims against them.

Ultimately, the R&R recommends granting summary judgment based on any or all of the above provisions. Defendants make two additional arguments in the Motion—that the patent exhaustion doctrine applies and that Plaintiff waived its right to raise certain points. But the R&R does not consider those arguments, because it finds doing so unnecessary in light of its other conclusions. ECF No. 78 at 14. Similarly, this Court need not consider all of Defendants' arguments, or even all of the provisions discussed in the R&R, to resolve the Motion.

## DISCUSSION

### I.      Legal Standard

A party may serve and file objections to a Report and Recommendation within fourteen days. FED. R. CIV. P. 72(a), (b)(2). "Parties filing objections must specifically identify those findings objected to. Frivolous, conclusive [sic] or general objections need not be considered by

the district court." *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir. 1982), *overruled on other grounds by Douglass v. United States Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996).

Courts must review *de novo* any of the Magistrate Judge's conclusions to which a party has specifically objected. *See* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). Any sections that were not clearly objected to are reviewed for clear error to determine whether they are contrary to law. *Id*.; *see also United States v. Wilson*, 864 F.2d 1219, 1221 (5th Cir. 1989), *cert. denied*, 492 U.S. 918 (1989).

## II.    Analysis

Plaintiff raises eight objections. To conserve judicial resources, the Court will address only the issues necessary to resolve the Motion. As such, the Court does not adopt the R&R's reasoning on issues not addressed in this Order. *See* FED. R. CIV. P. 72(b)(3) ("The district judge may accept, reject, or modify the recommended disposition.").

One of Plaintiff's objections is that the R&R does not address the "different payment channels" used by Defendants. ECF No. 80 at 2. Defendants use the Pay Systems for web and browser payments, for app payments, and at the point of in-person sale. *Id.*; ECF No. 72 at 6. The Court is mindful of these different mechanisms and will address them separately where necessary.

### a.    Section 2.3

Plaintiff raises three objections to the R&R's finding that Section 2.3 of the PSAs shields Defendants from liability: (1) Defendants are not Authorized Third Parties as to point-of-sale transactions, ECF No. 80 at 16–17, (2) Defendants do not obtain an Acquired Item related to point-of-sale transactions, ECF No. 80 at 17–18, and (3) Section 2.3 does not grant sublicenses,

ECF No. 80 at 4–8.  The Court agrees with the R&R that Section 2.3 provides an automatic sublicense to Defendants, requiring dismissal of this case.

Section 2.3 provides in part that "Authorized Third Parties who obtain an Acquired Item shall be granted a non-exclusive sublicense . . . to . . . use a method or process that includes steps implemented by an Acquired Item in combination with other steps."  ECF No. 60-7 at 5.  So to establish that this provision applies, Defendants must show that (1) they are Authorized Third Parties, (2) they obtained an Acquired Item, and (3) their conduct falls within the sublicense—that is, they "use a method or process that includes steps implemented by an Acquired Item in combination with other steps."  *Id.*  If Defendants satisfy those conditions, the remaining question is whether they actually received the sublicense described by Section 2.3.

### 1.  *Defendants Are Authorized Third Parties*

To start, Defendants are Authorized Third Parties.  An "Authorized Third Party" includes "any Entity that is implicitly or explicitly authorized" by the Initial Sublicensees to "perform any activities with respect to an Acquired Item."  ECF No. 60-7 at 2–3.  The definition explicitly includes "without limitation . . . assemblers, replicators, integrators, distributors, resellers, value-added resellers, customers and users."  *Id.*  Defendants are at the very least "users" of the Pay Systems for web, app, and point-of-sale transactions alike.

### 2.  *Defendants Obtained "Acquired Items"*

Defendants have also obtained Acquired Items.  Acquired Items include "(i) an item obtained, directly or indirectly, from" an Initial Sublicensee, "wherein such obtained item individually embodies one or more elements of a claim of a Licensed Patent, but is not itself a Licensed Product; (ii) plural items obtained, directly or indirectly from" an Initial Sublicensee, "wherein such obtained items, as used together, both embody one or more elements of a claim of

a licensed patent and are not a Licensed product; and/or (iii) a Licensed Product obtained, directly or indirectly, from" an Initial Sublicensee. ECF No. 60-7 at 3. The word "item" in this definition is broad—it includes "an article, component, software, specification, design, architecture, or other embodiment of one or more elements of a claim of a Licensed Patent." *Id.* "An Acquired Item shall also include a specification, design, architecture, technology, standard and/or interface licensed, provided, specified, distributed and/or developed, in whole or in part, by" the relevant Initial Sublicensee. *Id.* "Licensed Product" is also defined broadly, as "any and all product, hardware, machine, process, software, service, media, or composition of matter." *Id.*

### A. The Initial Sublicensees' Specifications and Standards are Acquired Items

In the context of web- and app- based transactions, Defendants clearly obtain "items" from the Initial Sublicensees—most obviously, "specifications" and "standards" developed by the Initial Sublicensees regarding how to implement the Pay Systems. *See* ECF Nos. 58-15, 58-16, 58-17. In fact, Plaintiff does not object to the R&R's conclusion on this point.

### B. The Pay Systems are Acquired Items

Defendants also obtain Acquired Items for point-of-sale transactions. Most directly, they obtain the Pay Systems. As noted above, an "item" under the definition of Acquired Item includes an "embodiment of one or more elements of a claim of a Licensed Patent." Plaintiff alleges that Defendants are, by using the Pay Systems, infringing Licensed Patents. The Court does not see how the Pay Systems could infringe a patent yet not include an embodiment of at least one element of one claim of that patent. So the Pay Systems are "items" under the definition of Acquired Items. And Defendants obtained the Pay Systems, at least indirectly, from the Initial Sublicensees—the

company from which Defendants got their point-of-sale terminals presumably got the necessary Pay-System technology from the Initial Sublicensees.

Alternatively, the Pay Systems are Acquired Items under the "Licensed Products" prong, since they are "process[es]," and/or "service[s]." ECF No. 60-7 at 3. Finally, the Pay Systems are Acquired Items because they are "design[s], architecture[s], [and/or] technology" "provided, specified, distributed and/or developed, in whole or in part, by" the Initial Sublicensees. *Id.* Ultimately, the definition of "Acquired Item" is—like much of the PSAs—very broad and seemingly meant to cover most products, systems, technologies, etc. that might infringe the Licensed Patents.

### C.  Defendants Obtain Encrypted "Tokens," Which are Acquired Items

For both point-of-sale and non-point-of-sale transactions, certain "tokens" received by Defendants are also Acquired Items. When someone uses a Pay System to make a purchase, their mobile device passes a "token" representing their debit or credit card, along with other information, to a merchant's point-of-sale terminal, website, or app. ECF No. 60 at 5–6. The merchant, banks, and other entities process this data to complete the transaction. *Id.*

The "tokens" embody an element of a claim of the Licensed Patents, making them "items" under the definition of Acquired Item. *See* ECF No. 37-2 at 97 ("The secure element adds the payment data for the specified card and merchant, creating an encrypted payment token . . . . It then passes . . . this token to network servers . . . ."); ECF No. 37-3 at 116 (same); ECF No. 37-4 at 55 (same). The Initial Sublicensees' software and devices create and transmit these "tokens," meaning the tokens are "obtained, directly or indirectly, from" the Initial Sublicensees. So the tokens are Acquired Items.

12

### 3.  Defendants' Conduct Falls Within Section 2.3's Sublicense

Finally, Defendants' conduct falls within Section 2.3(b)'s sublicense, because Defendants "use a method or process that includes steps implemented by" the aforementioned Acquired Items "in combination with other steps."  First, as to web- and app-based transactions, Defendants follow the Initial Sublicensees' specifications and standards (i.e., the Acquired Items) to implement the method(s) or process(es) that together comprise the Pay Systems.

Second, for point-of-sale transactions, Defendants "use a method or process that includes steps implemented by" the Pay Systems "in combination with other steps."  These "other steps" include, for example, use of the point-of-sale terminal, as well as ordinary aspects of banking and shopping, such as the bank transferring the funds from one account to another.

Finally, the "tokens" discussed above implement at least one step of a broader method or process in that they provide necessary information from the purchaser's device to other entities involved in the transaction.

### 4.  Section 2.3 Automatically Grants a Sublicense

All of that might not matter if, as Plaintiff argues, Section 2.3 did not grant a sublicense at all.  The Court, however, disagrees with that argument and holds that Section 2.3 automatically grants a sublicense when its conditions are met.

Section 2.3 says that an Authorized Third Party who obtains an Acquired Item "shall be granted a non-exclusive sublicense."  ECF No. 60-7 at 5.  Plaintiff argues that "shall be granted" is passive language, simply saying that some unspecified party must separately grant a sublicense. That reading is supported, Plaintiff says, by other parts of the PSAs that use more direct language to grant sublicenses.  ECF No. 80 at 4–5.  Plaintiff also points out that Section 2.1 says that the Initial Sublicensees' sublicenses are "non-sublicensable (except as set forth in Section 2.2)."  ECF

13

No. 60-7 at 2   So, Plaintiff argues, no section of the PSAs except Section 2.2 can provide a sublicense.

Starting with the first point, "shall be granted" in this context unambiguously means that the license will *automatically* be granted upon Section 2.3's conditions being met.  It is true that other sections of the PSA use more direct language to grant sublicenses to third parties.  For example, Section 2.2.4 says that AST "hereby grants to all third parties . . . who" meet certain conditions a sublicense.  ECF No. 60-7 at 4.  But that does not make the word "shall" any less mandatory.  *See Zurich Am. Ins. Co. v. St. Paul Surplus Lines, Inc.*, No. CIV.A. 4095-VCP, 2009 WL 4895120, at *7 n.55 (Del. Ch. Dec. 10, 2009), *as revised* (Apr. 14, 2010).[3]  And one could make the same argument going the other direction: in some provisions, the PSAs use clear language to indicate when a sublicense is *not* automatic.  For instance, Section 2.2.3 says the Initial Sublicensees "shall have the right to further sublicense."  ECF No. 60-7 at 3.  And Section 2.2.6 says the Initial Sublicensees "shall have the right to grant sublicenses."  ECF No. 60-7 at 4.  Yet Section 2.3 contains no similar language and, in fact, does not even say who would grant the required sublicenses if they were not automatic.

Plaintiff emphasizes that point—that Section 2.3 does not specify *who* "shall" grant the relevant sublicenses.  ECF No. 80 at 6.  But the point only supports the reading that Section 2.3's sublicense is automatic.  If the PSAs were meant to require a party to *separately* grant a sublicense, they presumably would have said so—and they presumably would have said *who*.  Section 2.3 specifies both the conditions under which a sublicense is required and the scope of said sublicense. Requiring separate action from some unspecified entity would serve no purpose and would, in fact, undermine Section 2.3's clear intent to require a sublicense when certain conditions are met.

---

[3] Delaware law governs interpretation of the PSAs.  ECF No. 60-6 ¶ 8.3; ECF No. 60-7 ¶ 8.3; ECF No. 60-8 ¶ 8.3.

Plaintiff provides two alternative interpretations of Section 2.3.  ECF No. 80 at 7–8.  First, it says that Section 2.3 might be meant to allow a party other than the Initial Sublicensees to grant sublicenses.  But Section 2.3 does not simply "allow" sublicenses—it requires them in certain circumstances.  Further, Section 2.3's sublicenses, whether automatic or not, are conditioned on being an Authorized Third Party of an Initial Sublicensee and on obtaining an Acquired Item from an Initial Sublicensee.  It seems unlikely that the sole purpose of a provision conditioned on one's relationship with an Initial Sublicensee would be to give some other entity authority to grant sublicenses.

Plaintiff's second proposed interpretation is that Section 2.3 provides mandatory *terms* for sublicenses separately granted under Section 2.2, where Section 2.3's conditions are met.  But Section 2.3 says that a sublicense shall be *granted*.  That goes further than simply requiring certain conditions if a sublicense is granted on a separate basis.

Moving to Plaintiff's last argument on this issue, Section 2.1's parenthetical does not change Section 2.3's meaning.  As already noted, Section 2.1 says that the Initial Sublicensees' sublicenses are non-sublicensable "(except as set forth in Section 2.2)."  ECF No. 60-7 at 2.  The Court agrees with the R&R that this parenthetical is best read to merely mean that the sublicenses are non-sublicensable except as otherwise specified in the PSAs.  Section 2.3's mandatory language demands this reading.

As Plaintiff acknowledges, "[t]he meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."  *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012).  Plaintiff would take this principle to mean that two words in a parenthetical— "Section 2.2"—ought to undermine (1) Section 2.3's clear language and (2) the PSAs' apparent

"scheme or plan" to allow broad protection for Initial Sublicensees' users, customers, etc. The R&R, on the other hand, understood a similar principle to require Section 2.3's substance to prevail. ECF No. 78 at 8–9 (citing *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1115 (Del. 1985)). The Court agrees with the R&R that Section 2.1's use of the label "Section 2.2" should not override Section 2.3's clear meaning or the PSA's broader scheme. *See E.I. du Pont*, 498 A.2d at 1115 ("[I]t is the overall effect of [] Agreements, rather than their precise label, which will determine whether [] an arrangement amounts to a sublicense.").

Ultimately, the Court finds that Section 2.3 automatically grants a sublicense to Defendants and that Defendants' conduct falls within that sublicense. Because this conclusion requires dismissal, the Court declines to consider Plaintiff's other arguments.

## CONCLUSION

For the foregoing reasons, the R&R's recommendation is **ADOPTED IN PART**. The Motion for Summary Judgment (ECF Nos. 58, 60) is **GRANTED**, and this case is **DISMISSED.** Final judgments will issue separately.

It is so **ORDERED**.

**SIGNED** this 18th day of March, 2026.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE